# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 97-3491

_____

| | | |
|---|---|---|
| Keith Hindman, | * | |
| | * | |
| Appellant, | * | Appeal from the United States |
| | * | District Court for the Western |
| v. | * | District of Arkansas |
| | * | |
| Transkrit Corporation, | * | [PUBLISHED] |
| | * | |
| Appellee. | * | |

_____

Submitted: April 17, 1998

Filed: June 1, 1998

_____

Before RICHARD S. ARNOLD,[1] Chief Judge, LOKEN, Circuit Judge, and PRATT,[2] District Judge.

_____

PRATT, District Judge

_____

[1]The Hon. Richard S. Arnold stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on April 17, 1998.  He has been succeeded by the Hon. Pasco M. Bowman II.

[2]The Hon. Robert W. Pratt, United States District Judge for the Southern District of Iowa, sitting by designation.

Keith Hindman appeals from a final judgment entered in the United States district court, granting summary judgment in favor of Transkrit Corporation, and thereby dismissing his claim that he was demoted in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-34 (1994). Hindman argues that the district court erred in finding "no evidence from which to conclude that plaintiff was replaced by a younger worker." A review of the record persuades us that the district court erred on this issue. We therefore reverse.

## I. BACKGROUND

The undisputed facts reveal that on March 1, 1996, at age 52, Keith Hindman (hereinafter Hindman) was demoted[3] from his position as journeyman collator operator at Transkrit Corporation, a company which is in the business of manufacturing or printing multi-part business forms.[4] Hindman had worked at Transkrit's Fort Smith plant since the fall of 1984, worked as a journeyman collator operator for approximately eight years, and was the oldest worker holding his position at the time of his demotion. At all relevant times, Henry Eubanks (hereinafter Eubanks) was Hindman's direct foreman and Gunner Lewald (hereinafter Lewald) was the department manager for the collating department.

In his position as a journeyman collator operator, Hindman received performance reviews, at least annually. These reviews, written by Eubanks, demonstrate that in all areas, excluding productivity, Hindman was favorably reviewed. He worked safely,

---

[3]The demotion caused Hindman's wage rate to be decreased from $15.75 per hour to $9.64 per hour. Additionally, the demotion had the potential to negatively impact on Hindman's pension.

[4]There are nine collator machines in the collating department at Transkrit which are used to assemble printed forms from rolls into multi-part business forms. It is the journeyman collator operator's responsibility to set up the collator properly for a particular job, run the machine, and trouble-shoot any problems, with a minimum of spoilage of forms, and a minimum of downtime.

maintained a good attitude, produced good quality forms, was knowledgeable, and reliable. The reviews also demonstrate that from September 1986, while Hindman was still in the position of collator operator trainee, until the last review before his demotion, Eubanks consistently advised Hindman that his production rating needed to improve.[5] Despite this criticism, however, Hindman consistently received a regular raise,[6] and he was never punished for this low productivity rating.

In his resistance to Transkrit's motion for summary judgment, Hindman submitted additional evidence to support the ultimate issue of whether he was intentionally discriminated against based on his age. In his deposition, Hindman testified that between March and July of 1993, Eubanks regularly made age-derogatory statements to him.[7] Eubanks also periodically suggested that Hindman find work elsewhere, stating that he could not understand how at his age Hindman wanted to do the work he was currently doing. Hindman recalled two specific occasions where: (1) Eubanks suggested that he become a Wal-Mart greeter; and (2) Eubanks brought in a classified advertisement for a loan-officer position and stated "that would probably be a real good, easy job for you."[8] Hindman also testified by affidavit that in February

---

[5]Hindman maintains that his supervisors intentionally attempted to minimize his production level in order to justify demoting him. He alleges, inter alia that Lewald selectively assigned him to jobs that would be less productive, that he was often assigned to work with many different and inexperienced collator helpers, and that in August of 1995, Eubanks began rotating him, on two week intervals, between a low productivity machine (number 4) and a higher productivity machine (number 7), thereby keeping his productivity rating average low.

[6]On one occasion, in December 1993, when his raise was held up due to productivity, Lewald later reinstated the raise and adjusted it retroactively to the beginning of the year.

[7]Such utterances included, inter alia: "I don't see how you can work the twelve-hour shifts at your age" and "I don't see how you climb around on the machine at your age." Hindman Dep. at 109; App. at 0107.

[8]Hindman Dep. at 112-13; App. at 109-10.

1996, after Hindman injured his ankle at home, Lewald commented "you are too old to be climbing around like that, you should let younger people do it."[9] Further, upon returning to work and saying to Eubanks that he hoped he would not need to have surgery, Eubanks responded, "at your age, I wouldn't do that."[10]

The summary judgment record demonstrates that on or about February 23, 1996, precipitating Hindman's demotion, Lewald reviewed the operators' "L sheets" and "make-ready sheets," and discovered that Hindman had a zero-production[11] day on the previous day. Lewald questioned Eubanks about this occurrence and Eubanks responded by sending a memorandum discussing two zero-production days and two "high spoilage" days which Hindman allegedly had in February 1996, and recommending that Hindman be demoted. As the circumstances surrounding the four days at issue are disputed, the court is required to view the facts in the light most favorable to Hindman.

On February 1, 1996, Lewald instructed Hindman to re-work[12] the front end crimp unit of a machine. This work took a great deal of time as Hindman had to search for many parts not existing on the machine, and thus Hindman did not have time to produce any forms during his shift. On February 22, 1996, Hindman came on after Dale Carter was half-way finished completing a changeover on a collator machine. Hindman finished the changeover and completed the make-ready for the job. He then

---

[9]Hindman Aff. ¶ 22; App. at 0199.

[10]Hindman Aff. ¶ 23; App. at 0199.

[11]A "zero production" day is a day in which the operator does not produce any forms during his or her shift.

[12]In other words, disassemble the machine, clean the shafts with emery cloth, remove end-drive gears, reset, and reassemble the crimp unit.

ran a check pack[13] for the job and submitted it to Eubanks, with approximately four hours left on his shift. Hindman waited for approximately thirty minutes before Eubanks eventually declined approval, and instead instructed Hindman to "re-web the collator."[14] As a result, Hindman spent the rest of his shift doing what he considered to be an "unnecessary partial make-ready on the machine,"[15] and again was unable to produce any forms. On February 24, 1996, Hollis Graham (a Trainer) put Hindman on machine number 2, a machine that had already been run during the previous shift, and directed him to complete the run. Hindman did not conduct a "check pack" on this machine prior to beginning production because it is "highly unusual for there to be defects since the prior run was acceptable."[16] Further, Hindman did not notice defects that occurred on the forms because he was working at the back of the machine. Finally, according to Hindman's affidavit, "the other spoilage . . . was due to circumstances beyond my control. The fact of the matter is that we simply ran out of a part of the form which was necessary for completion."[17]

Based on the memorandum from Eubanks, Lewald recommended to Dale Hixon that Hindman be demoted. Hindman was then demoted, effective March 1, 1996.

Subsequent to his demotion, no person was newly hired to replace Hindman.

---

[13]A "check pack" is a sample test run of forms which is prepared by a collator operator prior to beginning a production run. The check pack must meet specified guidelines in order to be approved for a production run.

[14] To "re-web" a machine, the operator is required to move some of the equipment on the machine without running forms.

[15]It is interesting to note that after his shift was over, Hindman left the check pack by his machine. The operator who replaced him presented it to John Glossenger, another supervisor, who approved the pack.

[16]Hindman Aff. ¶ 30; App. at 0204.

[17]Hindman Aff. ¶ 31; App. at 0205.

Hindman alleges, however, that he was effectively replaced by several younger workers already employed by Transkrit. In his affidavit, he testified that younger collator operators from other shifts stepped in to run machine number 4, the machine Hindman typically ran. He further testified that young trainees also operated machine number 4 after his demotion. Additionally, Hindman provided a list of individuals who worked on his shift, but who were not covering for someone on vacation or otherwise absent. This list contained specific names and dates. There is also deposition testimony by Hindman that "there were a number of people that replaced me . . . some under thirty, some under forty."[18] For example, he named David Criswell, Tom Newman, and Shawn Hallum, and indicated that he believed each of these individuals to be under thirty. In his deposition, he also testified to the approximate number of times each named individual took over his duties.

Hindman initiated this suit against Transkrit in September of 1996, alleging violation of the Age Discrimination in Employment Act (hereinafter ADEA), 29 U.S.C. § 621 et seq. On July 30, 1997, the district court entered summary judgment against Hindman, finding that Hindman could not make out a prima facie case of age discrimination. Hindman appeals from this decision.

## II. STANDARD OF REVIEW

This court reviews a district court's grant of summary judgment de novo, applying the same standard as the district court. *Hanenburg v. Principal Mut. Life Ins. Co.*, 118 F.3d 570, 573 (8th Cir. 1997); *Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 258 (8th Cir. 1996). The court will find that summary judgment was properly granted when the record, viewed in the light most favorable to the nonmoving party, and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Walsh v. United States*, 31 F.3d 696, 698 (8th Cir. 1994); *United States v. City of Columbia, Mo.*, 914 F.2d 151, 153 (8th Cir.1990); *Woodsmith Publ'g*

---

[18]Hindman Dep. at 123; App. 0303.

*Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir.1990).

This court has repeatedly cautioned that summary judgment should seldom be granted in the context of employment actions, as such actions are inherently fact based. *See, e.g., Chock v. Northwest Airlines Inc.*, 113 F.3d 861, 863 (8th Cir. 1997); *Hardin v. Hussman Corp.*, 45 F.3d 262, 264 (8th Cir. 1995); *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994). Summary judgment is not appropriate unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party. *See Hardin*, 45 F.3d at 262; *Crawford*, 37 F.3d at 1341.

## III. DISCUSSION

The ADEA prohibits an employer from discharging "any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The ADEA protects individuals who are at least forty years old. *See* 29 U.S.C. § 631.

To establish a claim under the ADEA, a plaintiff must show that he or she was intentionally discriminated against by the defendant, based on age. *See Ziegler v. Beverly Enterprises-Minnesota, Inc.*, 133 F.3d 671, 675 (8th Cir. 1998) (*citing Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 775 (8th Cir. 1995)); *see also Rothmeier v. Inv. Advisers, Inc.*, 85 F.3d 1328, 1331 (8th Cir. 1996). To survive a summary judgment motion, in a case which is not based on direct evidence of intentional discrimination, the plaintiff must rely on the *McDonnell Douglas* three-stage order of proof and presumptions.[19] *See generally McDonnell Douglas Corp. v. Green*, 411

---

[19]This Court has previously determined that the *McDonnell Douglas* test, which originated in the Title VII context, applies with equal force to ADEA cases. *See Madel v. FCI Marketing, Inc.*, 116 F.3d 1247, 1251 n.2 (8th Cir. 1997)(*citing*

U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

First, the plaintiff must establish a prima facie case of age discrimination. Generally, the plaintiff establishes this by producing evidence to show: (1) he or she is a member of a protected age group; (2) he or she was qualified for the position he held; (3) despite his or her qualifications, he or she was demoted; and (4) he or she was replaced by a younger person. *Ziegler*, 133 F.3d at 675 (citing *Hutson*, 63 F.3d at 776) . However, the Supreme Court and this court have recognized that the prima facie case in discrimination suits varies somewhat with the specific facts of each case; the standard is not inflexible.[20] *See McDonnell Douglas*, 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13 (noting that the standard, though a useful yardstick, "is not necessarily applicable in every respect to differing factual situations"); *see also Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), (emphasizing that the prima facie case is neither "rigid" nor "mechanized" and that the primary focus is always whether an employer treats an employee less favorably than other employees for an impermissible reason); *accord Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 944 (8th Cir. 1994). Further, the Supreme Court has

---

*Bashara v. Black Hills Corp.*, 26 F.3d 820, 823 (8th Cir. 1994)). The Supreme Court also has assumed, for now, that the test is applicable in these cases. *See O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996).

[20] In fact, this court has phrased the requisite elements of the prima facie case differently under differing circumstances. For example, in *Williams v. Valentec Kisco, Inc.*, 964 F.2d 723, 726 n. 2 (8th Cir.1992), the court stated that the fourth element of age discrimination is "that, after the discharge the position remained open and the employer continued to seek applications from persons with similar qualifications," whereas in *Kneibert v. Thomson Newspapers, Michigan, Inc.*, 129 F.3d 444, 452 n.4 (8th Cir. 1997), the court formulated the same element as "that the employer did not take such action against nonmembers of the protected class."

held that "[t]he  burden of establishing a prima facie case of disparate treatment is not onerous."  *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1094.

Once the plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for the employment decision.[21]  *Hutson*, 63 F.3d at 776-77.   If the employer provides a non-discriminatory reason, the presumption of discrimination disappears, and the plaintiff can only avoid summary judgment if he or she presents evidence that considered in its entirety,  (1) creates a question of material fact as to whether the defendant's proffered reasons are pretextual and (2) creates a reasonable inference that age was a determinative factor in the adverse employment decision.  *See Kneibert*, 129 F.3d at 452 (citing *Rothmeier*, 85 F.3d at 1336-37).  At all times, the plaintiff retains the burden of persuading the fact finder that intentional discrimination was the motivation for the adverse employment action.  *Rothmeier*, 85 F.3d at 1337.

The district court correctly determined, and Transkrit concedes, that Hindman met the first and third elements of the prima facie case of age discrimination:  he was a member of the protected age group and he was demoted.[22]  Further, the district court correctly concluded  there was a genuine issue of material fact as to whether Hindman was qualified for the position he held (i.e., he performed his job at a level that met Transkrit's legitimate expectations).[23]

The sole issue on appeal is whether or not Hindman met the fourth element of

---

[21]The district court, upon determining that Hindman failed to establish the fourth element of the prima facie case, did not evaluate the rest of the *McDonnell-Douglas* burden shifting analysis.  This court will thus focus its review on the issue of replacement.

[22]*See* Dist. Ct. Mem. Op. at 8, 9;  App. at 0592-93 .

[23]Id. at 9; App. at 0593.

the prima facie case, whether he was replaced.[24]  The district court found:

> No evidence from which to conclude that plaintiff was replaced by a younger worker.  Plaintiff submits no evidence in support of his bare contention that after his demotion, "younger" workers--both collator operators and trainees -- performed his job duties.  He has not provided the dates, times, names or ages of persons who "temporarily" performed his job after his demotion; he cannot identify any person who was assigned plaintiff's job.

> *See* Dist. Ct. Mem. Op. at 9, 10; App.0593-94.

This characterization of the record is erroneous.  As stated above, "[t]he  burden of establishing a prima facie case of disparate treatment is not onerous."  *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1094.  The summary judgment record plainly contains names of persons who temporarily performed Hindman's job duties after his demotion and dates on which they did so.   Hindman, in his affidavit, lists a number of dates and times where specific individuals took over his job duties by working on his shift, and not covering for an absentee, but rather acting as an additional collator.  Additionally, in his deposition testimony, Hindman lists the names of  younger collator operators  from other shifts who stepped in to run machine number 4 after his demotion.  Although, in the affidavit and deposition testimony, Hindman did not specify the actual ages of such individuals, he did state that they were significantly younger; "some under thirty, some under forty."[25]

Additionally, Exhibit A of "Defendant's Responses to Plaintiff's First Set of Interrogatories and Requests for Production," which was attached to "Plaintiff's

---

[24]It is important to note that when asked on oral argument if this was a reduction-in-force situation, Transkrit emphatically stated that it was not.  Their response to the question, posed by the court, was simply that Hindman was demoted for cause.

[25]Hindman Dep. at 123; App. at 0303-305 .

Motion and Brief to Compel Discovery," contains the birth dates of all collator operators, and thereby indicates the ages of some individuals who Hindman claims replaced him. Transkrit argues that this exhibit was not made part of the summary judgment record and is therefore not properly considered by this court. The court, however, disagrees, as this exhibit was specifically referred to on pages 3 and 4 of Hindman's "Memorandum Brief in Support Of Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment." Thus, this exhibit is undoubtedly a part of the summary judgment record, should have been considered by the lower court, and is now considered by this court.

Taken together, this evidence goes well beyond a "bare contention that after his demotion, 'younger' workers -- both collator operators and trainees -- performed his job duties." (*See* Dist. Ct. Mem. Op. at 9; App.0593). Hindman went beyond the pleadings and, by affidavit testimony, deposition testimony, and answers to interrogatories, designated specific facts showing that there is a genuine issue for trial regarding the fourth element of his prima facie case. *See* Fed.R.Civ.Pro. 56(c),(e).

Although the traditionally stated elements of a prima facie case tend to indicate Hindman was required to show that he was actually replaced by one individual or that his position was still open and Transkrit was seeking a similarly qualified applicant, this court has previously recognized that the prima facie case in discrimination suits varies somewhat with the specific facts of each case. *See, e.g., Ziegler*, 133 F.3d at 675; *Kneibert*, 129 F.3d at 452 n.4; *Williams*, 964 F.2d at 726 n. 2; and *Helfter*, 115 F.3d at 618. Under the present factual circumstances, there certainly exists a question of material fact, as to whether Transkrit actually used several other employees to take over Hindman's responsibilities and thereby effectively replaced him. Obviously, if Hindman had been replaced by one single individual, that fact would be relevant in evaluating Transkrit's motive. Nevertheless, it is entirely conceivable to this court that an ADEA plaintiff who was demoted and effectively replaced by many individuals adopting his duties may still be able to establish that he was the object of impermissible discrimination related to his age. *See Walker v. St. Anthony's Med. Ctr.,* 881 F.2d 554,

558 (8th Cir. 1989)  (citing *Giannotti v. Foundry Cafe*, 582 F.Supp. 503, 506 (D.Conn.1984)).  The court finds that the evidence regarding who replaced Hindman pertains to weight of evidence rather than to legal sufficiency.

The ultimate inquiry in any discrimination suit is whether the plaintiff has established that a prohibited factor played a determinative role in the employer's decision. *See McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 824 n. 13*; see also LeGrand v. Trustees of Univ. of Arkansas*, 821 F.2d 478, 480 (8th Cir. 1987).  This court finds that Hindman has presented sufficient evidence on the issue of  improper age discrimination.  The court finds that in addition to the evidence he presented regarding his replacement, Hindman also offered evidence that his supervisors, Eubanks and Lewald, both made age-derogatory comments towards him in 1993 and 1996,[26] and that these same individuals intentionally manipulated his work schedule in order to negatively impact his performance rating.  Accordingly, the court finds that the district court erred in holding Hindman did not establish the fourth element of the prima facie case of age discrimination.

## IV.  CONCLUSION

---

[26]The Court acknowledges some of these age-derogatory statements were made approximately three years prior to Hindman's demotion, however, we find that such statements may be relevant.  "A plaintiff's ability to prove discrimination indirectly, circumstantially, must not be crippled by evidentiary rulings that keep out probative evidence because of crabbed notions of relevance or excessive mistrust of juries." *Estes v. Dick Smith Ford, Inc.*, 856 F.2d 1097, 1103 (8th Cir.1988).  Such statements, even if not themselves actionable, may be deemed relevant as background evidence which if proven may assist Hindman in proving the ultimate issue of age discrimination. *See White v. Honeywell*, --- F.3d ---, ---, 1998 WL 181113 * 5 (8th Cir. 1998).

For the reasons discussed above, the order of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.

LOKEN, Circuit Judge, concurring.

I concur in the result.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.